ORIGINAL



FILED IN CLERK'S OFFICE
U S D C   Atlanta

FEB 0 9 2007

JAMES N. HATTEN, Clerk
By: _____ Clerk
        Deputy Clerk

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**

---

DANIEL E. BECNEL, JR., and MARY HOTARD BECNEL, Derivatively on Behalf of Nominal Defendant THE HOME DEPOT, INC.,

        Plaintiff,

vs.

ROBERT L. NARDELLI, GREGORY D. BRENNEMAN, JOHN L. CLENDENIN, CLAUDIO X. GONZÁLEZ, MILLEDGE A. HART, III, BONNIE G. HILL, LABAN P. JACKSON, JR., LAWRENCE R. JOHNSTON, KENNETH G. LANGONE, ANGELO R. MOZILO and THOMAS J. RIDGE,

        Defendants.

-and-

The Home Depot, Inc.

        Nominal Defendant.

Civil Action No.:_____

**1: 07 - CV - 0356**

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiffs, by and through their attorneys, derivatively on behalf of The Home Depot, Inc. ("Home Depot" or the "Company"), allege upon personal knowledge as to their own acts and upon information and belief, based upon the investigation conducted by and through their attorneys, documents filed by the Company with the Securities and Exchange Commission ("SEC") and reports appearing in the press, as follows.

## NATURE OF THE ACTION

1.      This is a derivative action brought by the plaintiffs as shareholders of Home Depot on behalf of the Company. The action is brought against the members of Home Depot's Board of Directors (the "Board"), including Defendants Gregory D. Brenneman ("Brenneman"), John L. Clendenin ("Clendenin"), Claudio X. González ("González"), Milledge A. Hart, III ("Hart"), Bonnie G. Hill ("Hill"), Laban P. Jackson, Jr. ("Jackson"), Lawrence R. Johnston ("Johnston"), Kenneth G. Langone ("Langone"), Angelo R. Mozilo ("Mozilo"), Thomas J. Ridge ("Ridge") and former Director Robert L. Nardelli ("Nardelli") for their breaches of fiduciary duties, including and especially their duty of loyalty in: (1) failing to take appropriate action pursuant to an internal investigation of a company-wide, long term, stock option backdating scheme; (2) awarding Defendant Nardelli an excessive compensation package; (3) as to some of the Defendants, their direct participation in the backdating and the exercise of back-dated options; (4) the participation of some Defendants in the dissemination of false and misleading statements, which artificially inflated the Company's financial statements due to, *inter alia*, the backdating scheme; and (5) ensuing litigation.

2.      Plaintiffs are now, and have been, at all relevant times, including prior to the public revelation of the wrongdoing described herein, stockholders of Home Depot.

3.      This action seeks redress for breaches of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment, mismanagement and self-dealing by the Board members and senior executives of Home Depot.

4.      As to the stock option backdating, certain of the Defendants or their predecessors either intentionally manipulated stock option grant dates between 1981 and at least 2000,

misstated exercise dates for stock options, failed to accurately report the grant dates of such stock options and failed to accurately report the exercise dates and tax consequences resulting from the exercise of such options or failed to take appropriate steps upon learning of such backdating.

5.      Even after the backdating stopped, certain of the defendants continued to issue blank stock options whose recipients, amounts, issue dates and strike prices were filled in later or backdated. The wrongful conduct was committed in furtherance of a scheme to unlawfully benefit the recipients of the stock options including certain of the defendants and such grants were *ultra vires* and in violation of the Company's stock option plan at the expense of Home Depot and its shareholders.

6.      The improper backdating of stock options materially impacted Home Depot's financial statements during the relevant period by causing Home Depot's compensation costs to be understated, resulting in unrecorded expenses of more than $200 million and the overstatement of earnings. This in turn lead to the artificial inflation of Home Depot's stock price, and a subsequent lawsuit, in which Home Depot may be held liable for millions of dollars. Furthermore, as a result of the understatement of expenses and failure to accurately report stock option compensation, Home Depot faces potential tax liabilities and penalties.

7.      Plaintiffs seek redress for defendants' breaches of fiduciary duty, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement in connection with the scheme in which certain of defendants or their predecessors permitted the diversion of hundreds of millions of dollars of Home Depot's assets to themselves, their predecessors, and other Home Depot insiders through the manipulation of the designated grant dates of hundreds of thousands of stock options issued to Home Depot directors and senior

- 3 -

management, and in which all defendants failed to take appropriate action pursuant to the Hogan & Hartson investigation, and approved the Nardelli severance package. Certain of the defendants, further, participated in the concealment of the options backdating and have declined to enforce the Company's rights by failing to require the directors and insiders who benefited from the option backdating to reimburse Home Depot for the hundreds of millions of dollars which the Company now acknowledges they received as a result of the improper options backdating.

8.     In furtherance and as a result of the backdating scheme, certain of the defendants caused Home Depot to file false and misleading statements with the SEC, including financial statements and proxy materials describing the Company's stock option plans as granting options to purchase shares of the Company's stock at the market price on the date that the option was granted, the accounting for which resulted in inflation of the Company's stock and the ensuing Securities Fraud Action.

9.     Defendants were, at all times, aware that stock options were being issued or had been issued based upon the price of Home Depot stock prior to and lower than the price on the date of issue and permitted such backdated options to be issued, received such backdated options as part of their compensation; failed to disclose the backdating of options and its effect on Home Depot's costs of compensation and earnings, and/or failed to take other appropriate action subjecting Home Depot to liability from regulators including the SEC and the Internal Revenue Service ("IRS") and to the substantial costs of investigation and compliance.

- 4 -

### JURISDICTION AND VENUE

10.     This action asserts violations under Delaware law for breach of fiduciary duty,
abuse of control, constructive fraud, corporate waste, unjust enrichment, gross mismanagement
and self-dealing, as Home Depot is incorporated in Delaware.

11.     This Court has jurisdiction over the Delaware state law claims asserted herein
pursuant to 28 U.S.C. § 1332 because complete diversity exists between the plaintiffs and each
defendant and the amount in controversy exceeds $75,000. This action is not a collusive action
designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) in that Home
Depot is headquartered in this district and maintains its principal office at 2455 Paces Ferry
Road, N.W., Atlanta, Georgia. The Company conducts business in this district and many of the
wrongful acts alleged herein took place in this district.

### Parties

13.     Plaintiffs Daniel E. Becnel, Jr. and Mary Hotard Becnel are, and at relevant times,
have been shareholders of Home Depot. Plaintiffs own 6,214 shares of Home Depot and reside
in Louisiana.

14.     Nominal Defendant Home Depot is a Delaware corporation with its principal
executive offices located at 2455 Paces Ferry Road, N.W., Atlanta, Georgia 30339. Home Depot
describes itself as the world's largest home improvement retailer, with stores in numerous
countries and the second largest retailer in the United States. It sells a wide assortment of
building materials, home improvement and lawn and garden products, home appliances,

plumbing and electrical supplies, and provides a number of related services. Through its HD Supply subsidiary the Company is also a diversified wholesale distributor.

15.     Defendant Nardelli was Chairman, Chief Executive Officer and President of Home Depot until his resignation in January 2007. Nardelli had been President and Chief Executive Officer since December 2000 and Chairman of Home Depot since January 2002. Nardelli also was Chairman of the Executive Committee. Nardelli is a citizen of Georgia. During the course of his tenure, Home Depot became the subject of numerous investigations and proceedings regarding its accounting procedures, stock option backdating and securities fraud.

16.     Defendant Brenneman has been a director of Home Depot since 2000 and is a member of the Audit Committee and the Nominating and Corporate Governance Committee. Brenneman is a citizen of Texas.

17.     Defendant Clendenin has been a director since 1996 and is a member of the Executive Committee and the Leadership Development and Compensation Committee. Clendenin also is Chairman of the Audit Committee. Clendenin is a citizen of Georgia.

18.     Defendant González has been a director since 2001 and is a member of the Leadership Development and Compensation Committee and the Audit Committee. González is a citizen of Mexico.

19.     Defendant Hart has been a director since 1978 and is a member of the Executive Committee and Chair of the Information Technology Advisory Council. Hart is a citizen of Texas.

20. Defendant Hill has been a director since 1999 and is a member of the Information Technology Advisory Council and is Chair of the Leadership Development and Compensation Committee. Hill is a citizen of California.

21. Defendant of Jackson has been a director since 2004 and is a member of the Audit Committee and the Nominating and Corporate Governance Committee. Jackson is a citizen of Kentucky.

22. Defendant Johnston has been a director since 2004 and is a member of the Leadership Development and Compensation Committee and the Information Technology Advisory Council. Johnston is a citizen of Idaho.

23. Defendant Langone has been a director since 1978. Langone is co-founder of Home Depot and has been the Lead Director since 1998. Langone is a member of the Executive Committee and the Audit Committee and is Chair of the Nominating and Corporate Governance Committee. Langone is a citizen of New York.

24. Defendant Mozilo has been a director since 2006. Mozilo is a member of the Leadership Development and Compensation Committee and the Nominating and Corporate Governance Committee. Mozilo is a citizen of California.

25. Defendant Ridge has been a director since 2005 and is a member of the Nominating and Corporate Governance Committee and the Information Technology Advisory Council. Ridge is a citizen of Pennsylvania.

26. The individuals identified in Paragraphs 14 through 25 are referred to collectively herein as the "Defendants".

**DEFENDANTS' DUTIES**

27.     Each of the Defendants owed to Home Depot and its shareholders the duty to
exercise a high degree of good faith, loyalty and diligence in the management and administration
of the affairs of the Company, as well as in the use and preservation of its property and assets. In
order to fulfill their duty of loyalty, Defendants were, at all times, required to act in the best
interests of Home Depot and its shareholders and in a manner in which there would be no
conflict between their duty and their self-interest. The requirement that directors act in good
faith is a condition of their duty of loyalty. A breach of the duty of loyalty is established when
the evidence demonstrates that a director was on both sides of a transaction or derived any
personal financial benefit from it in the sense of self-dealing as opposed to a benefit which
devolves upon the corporation or all shareholders generally. The conduct complained of herein
involved a knowing, intentional and culpable violation of their duties as directors. Moreover, the
Defendants have adopted and ratified the misconduct of Home Depot's officers and agents by
failing to take any legal action against them on behalf of the Company.

28.     By reason of their positions as officers, directors and fiduciaries of Home Depot,
and because of their ability to control the business and corporate affairs of Home Depot,
Defendants owed Home Depot and its shareholders fiduciary obligations of candor, trust, and
loyalty, and were required to use their ability to control and manage Home Depot in a fair, just,
honest and equitable manner and to act in furtherance of the best interests of Home Depot and its
shareholders so as to benefit all shareholders equally and not in furtherance of their personal
interest or benefit. Defendants had a duty to refrain from utilizing their control over Home
Depot to divert assets to themselves and their associates through improper and unlawful

- 8 -

practices. Defendants also had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings and compensation practices.

29.     As a result of their positions of control and authority as directors and officers of Home Depot, each of the defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein. Home Depot's directors wrongfully (a) agreed to and/or acquiesced in Defendants' option backdating scheme; (b) caused Home Depot to disseminate false proxy statements beginning not later than 1982 and, continuing to the present, disseminated proxy statements that failed to disclose Defendants' option backdating scheme and omitted the fact that officers of Home Depot were allowed to backdate their stock option grants in order to manipulate the strike price of the stock options that they received. Because of their positions with Home Depot, each of the defendants was aware of these wrongful acts.

30.     From 1982 to the present, Home Depot's proxy statements, prepared and/or authorized by the Defendants and their predecessors, stated that the stock option grants to Home Depot executives provided an exercise price that was not less than the fair market value of Home Depot stock on the date that each such option was granted, as calculated by the value of the stock at the market's close on that date or, if there were no trades on that date, at the close on the next preceding day on which there was a trade. Defendants concealed the fact that the stock option grants were repeatedly and intentionally backdated to ensure that the strike price associated with the option grants was at or near the lowest trading price of Home Depot stock during the month or longer period immediately preceding the date on which the options were granted. As a result of the Defendants' breaches of their fiduciary duties in the administration of the stock option plans, the self-dealing and the violation of the terms of the plans pursuant to which the stock

- 9 -

options were authorized and issued, plaintiff requests that the directors' and officers' plans be voided and gains from those plans returned to the Company. In the alternative, plaintiffs seek to have of all unexercised options granted to Defendants, their predecessors and Home Depot's officers between 1982 and 2000 cancelled, the financial gains obtained by any exercise of such options returned to the Company and to require the Defendants other than Nardelli to revise the Company's financial statements to reflect the truth regarding the grants of stock options, compensation costs and earnings.

31. Each of the Defendants, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. As directors, the Defendants were required to remain informed as to the operations of Home Depot, including its stock option plans and the system of stock option awards approved by the shareholders, the practices and manner in which stock options were being issued, the backdating of stock options and the improper accounting accorded to stock options and, upon receipt of notice or information, regarding improper or unsound practices, to make a reasonable inquiry in connection therewith and to take steps to correct such conditions or practices and to make the disclosures necessary to comply with the applicable laws and with their duties of candor and loyalty to the Company's shareholders.

32. The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Home Depot, the absence of good faith on their part, and a reckless disregard for their duties of loyalty, good faith and due

- 10 -

care to the Company and its shareholders. Defendants were aware, or should have been aware, that the wrongful conduct and their failure to act posed a risk of serious injury to the Company.

33. The Defendants breached their duties of loyalty and good faith by allowing or by themselves causing the Company to misrepresent its financial results and prospects as detailed hereinafter and by failing to prevent such actions. As a result, Home Depot has expended and will continue to be required to expend significant sums of money. Such expenditures include, but are not limited to: (a) the payment of excessive and unauthorized executive compensation; (b) increased capital costs as a result of the loss of market capitalization and the Company's damaged reputation in the investment community; (c) costs incurred to carry out internal investigations, including legal fees paid to outside counsel; (d) exposure to IRS penalties for improperly reporting compensation; and (e) liability to shareholders who purchased Home Depot securities at inflated prices in reliance upon the accuracy of Home Depot's financial statements, which included the improper information regarding compensation costs and earnings.

34. Home Depot has been further damaged in that the reliability of its management and financial statements has been called into question and may result in a reluctance by investors to invest in securities issued by the Company, increased difficulty in raising equity capital on favorable terms and the possibility of reduced credit ratings and less favorable borrowing terms.

## WRONGFUL CONDUCT

35. Beginning in 1981 and continuing through 2000, certain of the defendants and their predecessors caused Home Depot to grant them millions of stock options permitting them to buy Home Depot stock at significant discounts from the price on the date on which the stock option was granted. Such stock options were granted in violation of the terms of the Stock

Option Plans approved by the Company's shareholders and, therefore, were *ultra vires*, but nonetheless approved by certain of the Defendants and their predecessors. The Defendants, their predecessors and the Company officers who received such stock options then purchased Home Depot shares at the discounted prices, thereby depriving the Company of the value of these shares and the amount of capital which should have been paid and, in turn, sold the Home Depot shares at the price on the day that they exercised the options or as the stock price increased in the future.

36. A stock option gives the holder the right to buy the designated number of shares at the specified price in the future. Typically, issuers set the price at the same time their directors approve an option grant, with an exercise price (also known as the "strike price") usually set at the closing price of the stock on the day that the option is granted or, in some cases, the closing price on the day before the option was granted or by computing an average of the high and low prices on the day that the option was granted.

37. In the case of Home Dept, the stock option plans approved by the shareholders only permitted options to be issued with an exercise price equal to the closing price on the date that the option was granted or, if there were no sales on such date, the closing price on the nearest preceding date on which sales occurred. The plan did not give the Company or its directors any discretion to select a different date or price.

38. Options to purchase millions of shares of Home Depot stock, however, were granted to directors and Home Depot officers with an undisclosed and valuable feature: they were misdated or backdated, resulting in an exercise price lower than the price on the date that the option was granted. The misdating of stock option grants is typically accomplished by one of

- 12 -

three methods. In the first, recipients are awarded "look back" grants, in which the date of the grant is picked retroactively (e.g., the decision to grant the option is made in February but the option is dated with a January date at which time the shares were selling at a lower price.) The second variation is the granting of "wait and see" options in which the determination to grant the option is made on a particular day, but the decision is not finalized, and is sometimes changed, at a later date (e.g., a decision is made on January 1 to issue a stock option on January 15, but there is a period after January 15 during which the grantor waits to see if a more advantageous price occurs and, if one does, uses the later date instead of January 15.) A third variation is where a determination to grant stock options is made, however, particular terms regarding the option are not filled in (e.g., where there is a decision to issue an option as of a certain date, but after that date there are changes in the names of the grantees, the number of options to be issued to each grantee, etc. and, although the option has not been completed on the date when the number of options are authorized, when the determination is made as to who the recipient will be and the number of shares to be covered by the option, the option that is issued is dated with the earlier date when the determination to issue options was first made, even though the identity of the recipient and the number of shares had not been determined at that point.)

39. In an article published in the May 22, 2006 edition of *The Wall Street Journal*, former SEC Chairman Arthur Levitt, was quoted as stating that stock option backdating "represents the ultimate in greed." Further, Levitt stated, "It is stealing, in effect. It is ripping off shareholders in an unconscionable way."

40. Home Depot, through the actions of its Board of Directors and the Board's Leadership Development and Compensation Committee, granted stock options for the purchase of millions of shares of the Company's common stock to Defendants and their predecessors.

41. In its public filings with the SEC, including in shareholder-approved stock option plans, Home Depot represented that the exercise price of all of the stock options would be the fair market value of the stock which was defined as the closing price for the shares reported on a consolidated basis on the New York Stock Exchange on the relevant date or, if there were no sales on such date, the closing price on the nearest preceding date on which sales occurred.

42. Contrary to the Company's public disclosures, however, the measuring date for the price at which the options were granted to the Defendants and their predecessors during the period that options were being backdated was the product of manipulation. They were not, in fact, priced on the date of the grant or, if there were no sales on the date of the grant, at the closing price on the nearest preceding date on which sales occurred. Rather, the measuring date for the price of the option was backdated. The date which determined the price at which the option allowed to recipient to purchase Home Depot stock was designated as a date during the preceding month on which Home Depot shares traded at or near their lowest price for the period.

43. As a result of the backdating of options, Defendants and their predecessors who received improperly issued stock options have been unjustly enriched at the expense of Home Depot, which has received and will receive less money from the Defendants and the other recipients of backdated stock options when they exercise those options at prices substantially lower than the exercise price would have been if it had been correctly calculated as of the date that the option was actually granted. Since many of the stock options vested in the future or have

- 14 -

yet to be exercised, the harm to Home Depot resulting from the improper backdating will continue and the cost to the Company will continue to increase.

44. The use of backdated stock options provides unearned profits to the Defendants, their predecessors and the Company executives who received such improperly issued stock options, but also directly damages Home Depot, which is forced to issue shares for less money than it would have received if the options had been properly dated and valued. For each dollar that the person exercising an improperly backdated option saves, Home Depot loses a dollar. The additional profit to the stock option recipient resulting from the backdating of the option at a lower strike price, if permitted by the Company, is required to be accounted for as additional compensation to the recipient, and a cost to the Company. The failure to acknowledge this additional cost to the Company results in the overstatement of earnings and profits.

45. In authorizing the practice of backdating options, or in acquiescing in the practice and accepting backdated stock options, Defendants and their predecessors violated their fiduciary duty to act with the utmost honesty, loyalty, and good faith and, instead, acted in bad faith, in knowing and willful violation of the law and in order to profit at the expense of the Company and its shareholders. Even after the practice of backdating stock options was curtailed by the passage of the Sarbanes-Oxley statute and changes to the federal securities laws requiring that companies disclose the granting of options within two days, the Defendants and their predecessors who received improperly issued stock options continued to hold and exercise backdated options and failed to report or correct the understated compensation costs and resulting overstated earnings and profits, in further violation of their fiduciary duties of honesty, loyalty, and good faith and, instead, acted in bad faith, knowingly and willfully violating the law

for the purpose of keeping and protecting the profits that they and their associates obtained at the expense of the Company and its shareholders.

46.     Moreover, notwithstanding their knowledge that stock options had been improperly backdated, Defendants and their predecessors concealed that fact and continued to misrepresent, and to cause Home Depot to misrepresent, in its proxy materials and SEC filings, including Forms 14A, that stock options issued pursuant to the Company's stock option plans were priced at the fair market value computed by the closing price on the date of the grant, or, if there were no trades on the date of the grant, at the closing price on the next preceding date on which there were trades.

47.     Home Depot first acknowledged that some stock option grants had been backdated in June of 2006, but stated that its review had found five instances in which directors had approved grants retroactively, in one case more than two months after the stated date of the option, and said that the total amount of unrecorded compensation expense amounted to less than $10 million. Further, Home Depot stated that only two of the five instances involved options which had been issued with a strike price lower than the price on the date on which the option was actually granted. Home Depot contended that the remaining options were issued at less favorable prices to the insiders, with strike prices set higher than the closing price on the date that the option was actually granted. Home Depot acknowledged that, in one of the backdating incidents, 1.7 million options were issued at $53 per share when the price at the time that the options were actually granted, nearly two months later, was $57.25, resulting in an 8% profit before the options were even issued. Similarly, in February 1993, February 1996 and August 1999, stock options were issued with a grant date set at the preceding monthly low for the stock.

In February 1996, Home Depot's stock fell 8.5% in the five days preceding the date selected as the backdated issue date of the options and rose 11.2% in the five days following the date selected as the grant date.

48. Following the announcement of an inquiry by the SEC into its stock option backdating, Home Depot continued its internal investigation and, on or about December 6, 2006, in contrast to its June 2006 statement, admitted that the Company had routinely backdated stock options for twenty years, from 1981 to 2000, and that its understated compensation expense was not $10 million, as previously announced, but rather $200 million and had been going on for as long as Home Depot had been a public company. Home Depot further admitted that "for annual option grants and certain quarterly grants from 1981 through November 2000, the stated grant date was routinely earlier than the actual date on which the grants were approved by a committee of the board of directors." Further, Home Depot admitted that, in almost every case, the stock price on the actual approval date was higher than the price on the backdated grant date stated in the option. Home Depot further stated that, as a result of the backdating, it will be forced to decrease retained earnings by $200 million and increase paid-in capital by $200 million. Home Depot further admitted that the names of option recipients and the amounts to be received had been changed by its Stock Administration Department after the options had purportedly been granted for what the Company characterized as the retroactive correction of administrative errors. Home Depot also admitted that from December 1, 2000 through the end of 2001, stock options were issued with an exercise price based on the market price of the Company's stock "on the date of a meeting of the Board of Directors or some other date selected without the benefit of hindsight. The February 2001 annual grant was not finally allocated to recipients until several

- 17 -

weeks after the grant was approved. During this period, the stock administration department also corrected administrative errors retroactively and without separate approvals as in the period 2002 to the present."

49. Thus, Home Depot has admitted that, even in the period continuing from December 1, 2000 through the end of 2001, and continuing through the present, stock options were granted in violation of the terms of the stock option plans approved by the shareholders, which required that the options be priced at the closing price on the date of the grant or, if there were no trades on that date, at the closing price on the next preceding date on which there were trades. Home Depot further admitted that, during the backdating, management personnel followed a practice of reviewing closing prices for a prior period and selecting a date with a low stock price to increase the value of the options to employees on lists of grantees subsequently approved by a committee of the Board of Directors. Furthermore, annual option grants in 1994 through 2000, as well as many quarterly grants during that period, were not finally allocated among the recipients until several weeks after the stated grant date.

50. As a result of the wrongful conduct alleged herein and admitted by Home Depot, Defendants and their predecessors caused Home Depot shares to trade at artificially inflated levels by issuing a series of materially false and misleading statements, regarding the Company's financial results. These financial results misrepresented and omitted to disclose that the Company had insufficient internal controls that prevented it from issuing accurate financial reports and that, because of the intentionally improperly recorded stock-based compensation expenses, the Company's publicly reported financial statements and results presented an inflated view of Home Depot's earnings and earnings per share.

- 18 -

51.     In addition to the backdating of stock options and non-disclosures, Defendants placed their own interests ahead of Home Depot's best interests by approving grossly unreasonable executive compensation, regardless of the facts that the Company was losing market share to a major competitor and the Company's stock had fallen 12 percent during the six years that defendant Nardelli was CEO. Despite the Company's poor performance during his tenure, Nardelli was paid $225 million since he took over as CEO in December 2000.

52.     Nardelli's grossly excessive executive compensation was followed by an even more excessive $210 million severance package which Nardelli received at his departure from Home Depot.

53.     On January 3, 2007, a Company press release announced that the Board of Directors and Nardelli had "mutually agreed" that Nardelli would leave his positions as Home Depot's chairman, president and CEO, effective January 2, 2007. The press release further stated that, under the terms of his separation agreement, Nardelli will receive consideration currently valued at approximately $210 million, including among other things, a cash severance payment of $20 million, stock-based compensation valued at $129 million, retirement benefits valued at $32 million, lifetime health and life insurance valued at $18 million, and bonuses and long-term incentive awards of approximately $9 million.

54.     (a) At the time that the Defendants agreed to the grossly excessive severance package for Nardelli, a CEO who had left the Company in a weaker position than when he took the helm, Home Depot already knew that the stock option backdating scheme had cost the Company more than $200 million in wrongful discount stock options and that the Company faced additional liability for the nondisclosure of the backdating, the undisclosed compensation

costs and the overstatement of earnings and profits, as well as possible IRS penalties, and that Nardelli should have been terminated for cause. Instead, the Defendants agreed to let him receive grossly excessive and undeserved severance payments of $210 million from the Company's funds, in further breach of their fiduciary duties. The severance package constitutes a further waste for which the Defendants should be surcharged and that the Company is entitled to recover.

(b) After coming to Home Depot, Nardelli recruited Dennis Donovan ("Donovan") in 2001, to act as Home Depot's head of human resources and Frank Fernandez ("Fernandez"), also in 2001, as general counsel. After Nardelli, himself, Donovan and Fernandez became the second and third highest paid executives of Home Depot. In 2005 alone, Donovan received compensation of $6.67 million, and Fernandez $6.02 million, which included salary, bonus, stock options and incentives. Both reported directly to Nardelli and, indeed, Donovan's employment contract provided that it would end if he no longer reported directly to Nardelli. With the departure of Nardelli, with his rich severance package, the Company announced, on or about February 1, 2007, that both Donovan and Fernandez would leave the Company effective February 14, 2007. It was further announced that the Defendants had entered into "separation agreements" with Donovan and Fernandez providing that each of them would receive cash severance of $2.96 million and that their Company stock options would vest immediately, providing Donovan with vested stock options valued at $17 million and Fernandez with vested stock options valued at $16.5 million. The severance payments and stock options constitute a further waste of Home Depot's funds in the face of poor Company performance, improper stock option grants, reporting violations, misleading financial statements and a contract

- 20 -

that expired by its own terms without the requirement of additional benefits provided for in the
separation agreements.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

55. Plaintiffs bring this action on behalf of Home Depot to redress injuries suffered
by Home Depot as a result of Defendants' violations of law, breaches of fiduciary duty, abuse of
control, constructive fraud, gross mismanagement, corporate waste and unjust enrichment, as
well as the aiding and abetting thereof by Defendants.

56. Plaintiffs will adequately and fairly represent the interests of Home Depot and its
shareholders in enforcing and prosecuting its rights.

57. Plaintiffs own Home Depot stock and were owners of Home Depot stock during
times relevant to Defendants' illegal and wrongful course of conduct alleged herein.

58. Based upon the facts set forth throughout this Complaint, applicable law and the
longstanding rule that equity does not compel a useless and futile act, a pre-filing demand upon
the Home Depot Board of Directors to institute this action against the directors of Home Depot is
excused as futile. A pre-filing demand would be a useless and futile act because:

(a) Home Depot has already admitted that the wrongful backdating has cost
the Company at least $200 million, however, the defendant directors have shown no interest in
recovering such funds for the Company or even in canceling or correcting the admittedly
backdated stock options;

(b) the members of Home Depot's Board have demonstrated their
unwillingness and/or inability to act in compliance with their fiduciary obligations or to sue
themselves and their fellow directors for the violations of law complained of herein. Home

- 21 -

Depot's directors have developed professional relationships with the other members of the Board of Directors and are dependent upon the goodwill of the remaining directors to retain their positions as members of the Board. As a result, each of the directors has entangling financial alliances, interests and dependencies which prevent them from exercising independent judgment and vigorously prosecuting any such action.

(c)     The Home Depot directors participated in, approved and permitted the wrongs alleged herein, have taken no action to correct such wrongs and, indeed, have compounded such wrongs by failing to remove defendant Nardelli for cause and, instead, allowing him to resign and granting him a severance package valued at $210 million even after the announcement of the further investigation on December 6, 2006. The directors committed further waste of Home Depot's assets by entering into separation agreements providing millions of dollars to Donovan and Fernandez.

(d)     The Home Depot directors participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's shareholders or recklessly and/or negligently disregarded the wrongs complained of herein and are, therefore, not disinterested parties. As a result of their access to, and review of, internal corporate documents, conversations and connections with other directors and corporate officers and employees, attendance at management and/or board meetings, each of the Defendants knew the adverse non-public information regarding the improper stock option grants and financial reporting and have engaged in and approved waste of Company assets. Pursuant to their specific duties as Board members, the Defendants are charged with the management of the Company and with conducting its business affairs. Defendants

breached the fiduciary duties that they owed to Home Depot and its shareholders in that they have failed to prevent and correct the improper stock option granting and financial reporting and engaged in and approved waste of Company assets. Several of the directors have personally benefited by the backdating of stock options and have personally profited at the expense of Home Depot. As a result, the Home Depot directors cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of the directors participated personally in the wrongdoing and cover-up or are dependent for their positions upon Defendants who did.

(e)     The acts complained of constitute violations of the fiduciary duties owed by Home Depot's directors and these acts are incapable of ratification.

(f)     The members of Home Depot's Board of Directors have benefited, and will continue to benefit, from the wrongdoing alleged herein and have engaged in such conduct to preserve their positions of control and the perquisites derived therefrom, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

(g)     Home Depot has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the current Board of Directors has not filed any lawsuits against itself or any of the others who were responsible for the wrongful conduct in order to recover for Home Depot any part of the damages that Home Depot suffered and will suffer as a result of the wrongs alleged herein, many of which have been admitted by Home Depot as set forth in its press release of December 6, 2006, described in more detail elsewhere in this Complaint.

(h)     In order to properly prosecute this lawsuit, the directors would have to sue themselves and the other members of the Board of Directors, requiring them to expose themselves and the other Board members to millions of dollars in potential civil liability and criminal sanctions or IRS penalties. Notwithstanding having received the report detailing the wrongful backdating of stock options and the cover-up, defendants have not commenced suit and will not do so.

(i)     Home Depot's current and past directors and officers are insured against personal liability for their acts of mismanagement, waste and breach of fiduciary duty as alleged in this Complaint by directors' and officers' liability insurance carried by the Company and paid for with corporate funds, i.e., funds belonging to the shareholders of Home Depot. Under these policies and because of a defense known as the insured versus insured exclusion, however, the insurance coverage of the Defendant directors would be eliminated if the action were brought directly by Home Depot or one or more of its directors against some or all of the directors. As a result, if Home Depot were to sue the directors or, if the directors were to bring suit against themselves, the directors' and officers' liability insurance, for which the Company paid, would be unavailable. If, on the other hand, the suit is brought derivatively, as this action is brought, the directors' and officers' liability insurance remains available to protect the Defendants and to fund a recovery for the Company.

59.     In or around August 2006, Home Depot undertook an internal investigation into the way that stock options had been issued. The Board of Directors asked its Audit Committee to conduct the inquiry. The Audit Committee, in turn, assigned the task to a subcommittee. The Audit Committee, and each member thereof, however, was conflicted. Under the Audit

- 24 -

Committee's Charter, it was the Audit Committee that was charged with overseeing the integrity of Home Depot's financial reporting and the adequacy of its internal controls and procedures and disclosure controls and procedures.

(a)     Article I of the Audit Committee's Charter, ¶ 2 (a), makes the Audit Committee responsible for reviewing financial reports and other financial information. ¶ 2 (b) makes the Audit Committee responsible for reviewing the Company's systems of internal controls and procedures and disclosure controls and procedures.

(b)     Under Article IV, ¶ A 4, the Audit Committee was responsible for reviewing the significant internal reports to management prepared by the Internal Audit Department and management's responses, which reviews were required to consider the integrity of the Company's financial reporting processes and controls.

(c)     Under Article IV, ¶ A 8, the Audit Committee was charged with reviewing disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer regarding any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees with a significant role in the Company's internal controls.

(d)     Under Article IV, ¶ A 9 (a), the Audit Committee was responsible for reviewing and discussing with management and the Company's independent auditors major issues regarding accounting principles and financial statement presentations including major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies.

(e)     Under Article IV, ¶ A 11, the Audit Committee was required to report regularly, and at least quarterly, to the Board of Directors and to promptly review with the Board any issues that arose with respect to the quality or integrity of the Company's financial statements and the Company's compliance with legal or regulatory requirements.

60.     Members of the Audit Committee had been the recipients of stock options during the period that options were being backdated. They also knew that other members of the Board of Directors had received such options. As members of the Board of Directors, they knew the dates on which such options had actually been approved and issued and that the issue dates and strike prices reflected on such options were not the dates on which the Board had approved and issued such options or the closing prices on the dates of issuance. The members of the Audit Committee also knew that the options being issued were not authorized under the stock option plans approved by the Home Depot shareholders because those plans only permitted options that were issued at fair market value and required that the option strike price had to be the closing price on the date of issue unless there was no trading on the date of issue, in which case the closing price on the preceding day of trading could be used. As Directors, the members of the Audit Committee were aware of the requirements of the stock option plans submitted to, and approved by, the shareholders and were also aware that the stock options that were being issued to them and their colleagues did not comply with those requirements. Moreover, as members of the Board of Directors, they also knew that options were being authorized with names and amounts to be filed in at a later date and that awards of options were being completed and revised by Home Depot's Stock Administration Department without further authorization or supervision by the Board of Directors.

- 26 -

61.     The Charter of the Audit Committee placed the responsibility for reviewing and reporting these internal control weaknesses and violations on the Audit Committee. The Charter of the Audit Committee further placed upon the Audit Committee the responsibility for reviewing the financial reports and financial information issued by the Company. By reason of their knowledge that options were being or had been backdated and that the resulting strike prices were lower than if the options had been accurately dated, the Audit Committee and its members knew that the financial reports and disclosures being issued by Home Depot were under-reporting compensation costs and, as a result, overstating earnings and profits. In violation of their duties under their Charter, the Audit Committee and its members failed to either disclose or correct these misstatements and continued to fail to disclose or correct them. To this day, there has been no disclosure or correction, except to the extent that the December 6, 2006 Home Depot press release contained an estimate of the aggregate amount of the underreporting of compensation costs.

62.     In its press release of December 6, 2006 summarizing the findings of the subcommittee of the Audit Committee that conducted the internal investigation, Home Depot reports that "The subcommittee concluded that there was no intentional wrongdoing by any current member of the Company's management team or its Board of Directors." As members of the committee that was charged with overseeing the accuracy of financial reporting, the adequacy of internal controls and procedures and disclosure controls and procedures, the members of the Audit Committee were being asked to review the adequacy of their own performance, oversight and disclosures and were therefore conflicted and could not, and can not, exercise independent judgment.

63.     Similarly, each member of Home Depot's Board of Directors knew that the stock options that they and/or their colleagues were receiving or had received were being or had been improperly backdated, were not dated as of the dates that they had been approved by the Board of Directors, were not permitted under the requirements of the stock option plans that had been submitted for approval to, and approved by, the Company's shareholders, and had never been authorized by those shareholders. The Directors further knew that the stock options being approved with blanks for the recipient, date of issue, number of shares and strike price were improper and that the Stock Administration Department was filling in and correcting such details without further authorization from the Board of Directors and without supervision. Notwithstanding such knowledge, the Directors took no steps to stop the improper and unauthorized issuance of Company stock options, took no steps to require adequate disclosure of such backdating or to disclose or correct the understated compensation data or the overstated earnings and profit data, have taken no action to recover the funds lost by the Company as a result of such improper and unauthorized issuance of stock options, have taken no action to cancel stock options that were issued without shareholder authorization or in violation of the stock option plans approved by the shareholders, and/or personally benefited from such improperly issued stock options. The members of Home Depot's Board of Directors are, therefore, conflicted and could not, and can not, exercise the independent judgment necessary to bring and prosecute this action.

64.     Demand upon the shareholders is not required and plaintiffs have not made such a demand. Such demand would be futile and a useless act for the following reasons:

(a) Home Depot is a public traded and widely held company with millions of shares outstanding and thousands of shareholders;

(b) Many, if not most, of those shareholders are lay persons who are unfamiliar with legal proceedings, the fiduciary duties of directors, and the importance of holding directors accountable for breaches of fiduciary duties;

(c) Making demand on such a large number of shareholders would be impossible for plaintiffs, who have no way of finding out the names, addresses or telephone numbers of such shareholders; and

(d) Making demand on all shareholders would force plaintiffs to incur huge expenses, even assuming that all shareholders could be individually identified, and would make the bringing of the action impractical.

(e) The wrongs alleged are not subject to ratification.

65. From 1981 through and including the present, Home Depot has filed annual reports on Form 10-K with the SEC. Each of those Forms 10-K are also made available to shareholders and the public. By reason of the understatement of compensation costs, the overstatement of earnings and profits, and the failure to properly account for backdated stock options, the financial statements included in each of those Forms 10-K were materially false and misleading and presented in violation of Generally Acceptable Accounting Principles ("GAAP").

66. Each of Home Depot's proxy statements issued between 1981 and the present concealed the option backdating scheme being engaged in by Home Depot, understated the compensation being received by the directors whose election was being sought, overstated the earnings and profits of the Company and concealed the breaches of fiduciary duties of the

- 29 -

nominees for election to Home Depot's Board of Directors. It was not until Home Depot's June 2006 and December 6, 2006 press releases disclosing the results of internal investigations that shareholders began to learn the truth. Defendants have been unjustly enriched at the expense of Home Depot, which has received, and will receive, less money from the Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.

67.     Since 1981, Home Depot has sought shareholder approval of stock option plans designed to benefit directors, officers and employees of Home Depot. In each case, the description of the stock option plan and the basis upon which the strike price of options for which approval was sought was materially misstated and the approvals of those stock option plans were obtained upon the basis of materially false and misleading descriptions of the prices at which stock options would be granted if the plan was approved. As the result, the approvals of such stock option plans were obtained on the basis of materially misleading descriptions and any and all options granted pursuant to such plans should be rescinded and voided.

## TOLLING OF STATUTE OF LIMITATIONS

68.     The claims alleged herein are timely brought. Defendants and their predecessors wrongfully concealed their manipulation and misuse of the stock option plans through: strategic timing, fraudulent backdating and issuance of stock options with the names of recipients, amounts of stock, dates of issuance and strike prices to be filled in at a later date; by issuing false and misleading proxy statements that falsely portrayed Home Depot's stock option practices and the grants as having been properly made and dated, and diligently administered by a committee of independent directors; by failing to disclose that the options were, in fact, being

- 30 -

backdated; and by issuing financial statements that failed to disclose the additional compensation costs resulting from the options backdating and, therefore, misrepresented Home Depot's earnings and profits. Home Depot's public investors had no way to know of the breaches of fiduciary duty until Home Depot's June 2006 and December 6, 2006 disclosures and Home Depot's disclosure, on or about June 23, 2006, that the SEC had begun an inquiry regarding option practices at Home Depot.

## COUNT I
### (Accounting Against All Defendants)

69.     Plaintiffs repeat and reallege paragraphs 1 through 68 .

70.     At all relevant times, Defendants, as directors of Home Depot owed the Company and its shareholders fiduciary duties of good faith, candor and loyalty.

71.     In breach of their fiduciary duties Defendants caused Home Depot, among other things, to grant backdated stock options to themselves and certain officers and employees of Home Depot and/or failed to properly investigate whether these grants had been properly made. By virtue of this wrongdoing, Defendants breached their fiduciary duties owed to Home Depot and its shareholders.

72.     Defendants possessed complete and unfettered control over the improperly issued stock options grants and the books and records of the Company concerning the details of such improperly backdated stock option grants to certain of the Defendants, their predecessors, and certain of the officers and employees of Home Depot.

73.     As a result of Defendants' misconduct, Home Depot has been substantially injured and damaged financially and is entitled to a recovery as a result thereof, including the proceeds of those improperly granted options which have been exercised or sold.

74.     Plaintiffs demand an accounting be made of all stock option grants made to any of the Defendants, to their predecessors, and to Home Depot's officers and employees, including, without limitation, the dates of the grants, the amounts of the grants, the strike price of the grants, the value of the grants, the recipients of the grants, the exercise date of stock options granted to any of such individuals, as well as the disposition of any proceeds received by any of the Defendants upon the sale or other exercise of backdated stock option grants received by those Defendants.

## COUNT II
### (Breach of Fiduciary Duties and/or Aiding and Abetting Against All Defendants)

75.     Plaintiffs repeat and reallege paragraphs 1 through 68.

76.     Each of the Defendants agreed to and did participate with the other Defendants and/or aided and abetting one another in a deliberate course of action designed to divert corporate assets in breach of fiduciary duties the Defendants owed to the Company and engaged in a cover-up of the stock option backdating scheme and its cost to the Company.

77.     The Defendants have violated fiduciary duties of good faith, loyalty, candor and independence owed to Home Depot and its public shareholders, have engaged in unlawful self-dealing and have acted to put their personal interest and/or their colleagues' interest ahead of the interests of Home Depot and its shareholders.

78.     As demonstrated by the allegations above, Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to Home Depot and its public shareholders, failed to adequately inform themselves, and failed to disclose material information and/or made material misrepresentations to shareholders regarding

Defendants' option backdating scheme and the improper options backdating engaged in by Defendants and their predecessors since 1981.

79. By reason of the foregoing acts, practices and course of conduct, Defendants have failed to exercise ordinary care and diligence and have been grossly negligent in the exercise of their fiduciary obligations toward Home Depot and its shareholders.

80. As a proximate result of Defendants' conduct, Home Depot has been injured and is entitled to damages.

## COUNT III
## (Abuse of Control Against All Defendants)

81. Plaintiffs repeat and reallege paragraphs 1 through 68.

82. The Defendants employed the alleged scheme for the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over, Home Depot and to continue to receive the substantial benefits, salaries and emoluments associated with their positions at Home Depot. As part of the scheme, Defendants actively made, and/or participated in the making of, or aided and abetted the making of, misrepresentations regarding Home Depot.

83. Those Defendants who received backdated stock options further engaged in the scheme alleged herein in order to maintain the benefit of those backdated stock options and prevent the disclosure of the backdating scheme in order to avoid the loss of the benefits of the backdating scheme.

84. Defendants' conduct constituted an abuse of their ability to control and influence Home Depot.

85. By reason of the foregoing, Home Depot has been damaged.

- 33 -

## COUNT IV
### (Gross Mismanagement Against All Defendants)

86.     Plaintiffs repeat and reallege paragraphs 1 through 68.

87.     Defendants had a duty to Home Depot and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Home Depot.

88.     Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Home Depot in a manner consistent with the duties imposed upon them by law. By committing the misconduct alleged herein, Defendants breached their fiduciary duties of due care, loyalty, diligence and candor in the management and administration of Home Depot's affairs and in the use and preservation of Home Depot's assets. Moreover, to the extent that any of the Defendants claims not to have been aware of the backdating of stock options and the cover-up of the understatement of compensations costs and resulting overstatement of earnings and profits, said Defendants engaged in gross mismanagement in failing to properly inform themselves regarding the business and practices of Home Depot and of the circumstances surrounding the issuance of stock options to themselves and their co-directors.

89.     During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Home Depot to engaged in the scheme complained of herein, which they knew had an unreasonable risk of damage to Home Depot, thus breaching their duties to the Company. And as result, Defendants grossly mismanaged Home Depot.

90.     By the reason of the foregoing, Home Depot has been damaged.

## COUNT V
## (Constructive Fraud Against All Defendants)

91.     Plaintiffs repeat and reallege paragraphs 1 through 68.

92.     As corporate fiduciaries, Defendants owed to Home Depot and it shareholders a
duty of candor and full and accurate disclosure regarding the true state of Home Depot's
business and assets and their conduct with regard thereto.

93.     As a result of the conduct complained of, Defendants made, or aided and abetted
the making of, numerous misrepresentations to and/or concealed material facts from Home
Depot's shareholders despite their duties to, *inter alia,* disclose the true facts regarding their
stewardship of Home Depot. Thus they have committed constructive fraud and violated their
duty of candor.

94.     Defendants' conduct in failing to disclose the wrongful backdating of stock
options and its effect upon Home Depot's compensation costs, earnings and profits, sought to
prevent discovery of the backdating of stock options and to permit themselves, their predecessors
and Home Depot's management and employees to retain the benefits of the improperly issued
stock options.

95.     By reason of the foregoing, Home Depot has been damaged.

## COUNT VI
## (Corporate Waste Against All Defendants)

96.     Plaintiffs repeat and reallege paragraphs 1 through 68.

97.     By failing to properly consider the interests of the Company and its public
shareholders; by failing to conduct proper supervision; by failing to adequately inform
themselves; by giving away millions of dollars to the Defendants and the management and

employees of Home Depot via the options of backdating scheme; by the approval of a severance package valued at \$210 million for defendant Nardelli, who should have been removed for cause following the disclosures of options backdating and the cover-up on December 6, 2006; and by entering into the separation agreements with Donovan and Fernandez, Defendants have caused Home Depot to waste valuable corporate assets.

98.     Defendants should be surcharged for such waste.

99.     As a result of Defendants' corporate waste, they are liable to Home Depot.

## COUNT VII
## (Unjust Enrichment Against All Defendants)

100.    Plaintiffs repeat and reallege paragraphs 1 through 68.

101.    As a result of the conduct described above, Defendants will be and have been unjustly enriched at the expense of Home Depot, in the form of unjustified salaries, benefits, bonuses, stock options grants and other emoluments of office.

102.    All the payments and benefits provided to the Defendants were at the expense of Home Depot. The Company received no benefit from these payments. Home Depot was damaged by such payments.

103.    As to those Defendants who sold Home Depot stock for a profit during the period of deception, misusing confidential non-public corporate information, such Defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of Home Depot. A constructive trust for the benefit of the Company should be imposed upon such gains.

## COUNT VIII
### (Rescission Against All Defendants)

104.    Plaintiffs repeat and reallege paragraphs 1 thorough 68.

105.    As a result of the acts alleged herein, all of the stock option grants received by Defendants from Home Depot through 2001 and thereafter were obtained through Defendants' fraud, deceit, and breach of fiduciary duty. Further, the backdated stock options were ultra vires and thus invalid as they were not authorized in accordance with the terms of the publicly filed contracts regarding the Company's stock option plan which was approved by Home Depot shareholders and filed with the SEC.

106.    All stock option grants awarded during the time that such stock options were being backdated, issued in blank, and filled in or changed by the stock administration department should, therefore, be rescinded and all sums received as a result of the exercise of such options should be required to be paid to the Company.

WHEREFORE, plaintiffs demand judgment as follows:

(a)    Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, and to insure that Defendants do not participate therein or benefit thereby;

(b)    Directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

- 37 -

(c)     Ordering the imposition of a constructive trust over Defendants' stock options and any proceeds derived therefrom;

(d)     Canceling and voiding all backdated stock options and all stock options that were not issued in strict conformity with the terms of the stock option plans approved by shareholders;

(e)     Voiding the severance package given to defendant Nardelli and the separation agreements with Donovan and Fernandez and imposing a trust upon all funds, stock and benefits paid or to be paid thereunder;

(f)     Awarding punitive damages against Defendants and in favor of Home Depot;

(g)     Directing Home Depot to take all necessary actions to reform and improve its corporate governance and internal procedures, including, but not limited to (i) making certain that the Company's independent auditors audit all stock options grants to make certain that all such grants are issued in compliance with applicable law and in accordance with the terms and restrictions of the stock option plans adopted by the shareholders; and (ii) requiring the establishment of an advisory committee composed of outside directors and academics to review Home Depot's compensation plans and policies and to make certain that the interests of the shareholders are protected in the establishment of compensation and severance packages;

(h)     Awarding to plaintiffs the costs and disbursements of this action, including reasonable attorneys', accountants' and experts' fees; and

(i)     Granting such other and further relief as this court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

**HOLZER & HOLZER, LLC**

Corey D. Holzer
Georgia Bar No. 364698
Michael I. Fistel, Jr.
Georgia Bar No. 262062
1117 Perimeter Center West
Suite E-107
Atlanta, Georgia 30338
Telephone:  (770) 392-0090
Facsimile:  (770) 392-0029

**LABATON SUCHAROW & RUDOFF LLP**
Eric Belfi
100 Park Avenue
New York, New York 10017
Telephone:  (212) 907-0700
Telecopier:  (212) 818-0477

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Michael Goldberg
1801 Avenue of the Stars – Suite 311
Los Angeles, California  90067
Telephone:  (310) 201-9150
Telecopier: (310) 201-9160

*Attorneys for Plaintiffs*

VERIFICATION

State of Louisiana                          :
                                            :ss
Parish of St. John the Baptist              :

      Daniel E. Becnel, Jr. and Mary Hotard Becnel, each being duly sworn, depose and verify as follows:

      I am a plaintiff in the within derivative action on behalf of the nominal defendant The Home Depot, Inc. ("Home Depot"). I am currently a shareholder of Home Depot and was a shareholder at all times relevant to the misconduct complained of in the Verified Shareholder Derivative Complaint ("Complaint"). The action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have. I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe them to be true. As to those allegations as to which I do not have personal knowledge, I rely on my counsel and their investigation and believe them to be true. Having received and reviewed a copy of this Complaint, and having reviewed it with my counsel, I hereby authorize its filing.

                                           _____
                                           Daniel E. Becnel, Jr.

Sworn to before me this
  **5th** day of _February_____ , 2007


_____
      Notary Public
    **Matthew B. Moreland, Notary Public**
        La. Bar #24567
        Attorney-at-Law
    **My commission is for life.**

                              _____
                             Mary Hotard Becnel

Sworn to before me this
  **5th** day of _February_____ , 2007


_____
      Notary Public

    **Matthew B. Moreland, Notary Public**
        La. Bar #24567
        Attorney-at-Law
    **My commission is for life.**

666183 v1
[2/2/2007 17:29]